J-S37024-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDREW SMITH | : | |
| | : | |
| Appellant | : | No. 3695 EDA 2018 |

Appeal from the PCRA Order Entered November 30, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-1300825-2006

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDREW SMITH | : | |
| | : | |
| Appellant | : | No. 3696 EDA 2018 |

Appeal from the PCRA Order Entered November 30, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008249-2007

BEFORE: SHOGAN, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY NICHOLS, J.: **FILED DECEMBER 22, 2020**

Appellant Andrew Smith appeals from the order denying his Post-Conviction Relief Act[1] (PCRA) petition after a panel of this Court remanded the matter for an evidentiary hearing. Appellant argues that the PCRA court erred in denying relief on his claim that trial counsel was ineffective. We affirm.

_____

[1] 42 Pa.C.S. § 9541-9546.

The PCRA court summarized the underlying facts of this matter as follows:

[Following Appellant's arrest in 2006, the Commonwealth charged him with] two counts of rape of a child under [the age of thirteen], two counts of unlawful contact with a minor[], two counts of corruption of a minor[], and one count of aggravated assault. The charges arose out of Appellant's sexual attacks upon two twelve-year-old girls: J.D.R. and G.O.]

The first victim, J.D.R.[,] lived with her mother in Florida during the school year and with her father in Philadelphia during the summer months. During the summer of 2004, J.D.R. first met [Appellant] when their karate classes conducted a demonstration at a fundraiser benefit. Their relationship progressed over the next year, and by the summer of 2005, [then twelve-year-old] J.D.R. began considering [Appellant] her boyfriend. At approximately 1:00 a.m. one summer evening in 2005, J.D.R. spoke on the phone with [then 18-year-old] Appellant. During this conversation, J.D.R. told [Appellant] she was visiting her grandmother's house in Southwest Philadelphia and spending the night there. [Appellant] asked J.D.R. if he could come over. At first, J.D.R. said "no," but after [Appellant] persisted, she agreed.

When he first arrived, [Appellant] and J.D.R. talked and kissed. Later, [Appellant] tried to unbutton J.D.R.'s pants, but she initially said "no." [Appellant] told J.D.R., "I want to do this because I love you, and I want to show you how I love you." J.D.R. continued to say "no" and [Appellant] backed off. However, later on, [Appellant] attempted to unbutton J.D.R.'s pants again. When J.D.R. objected, [Appellant] became angry and began to leave.

When [Appellant] got up to leave, J.D.R. said "okay, I'll do it. Okay." [Appellant] then penetrated J.D.R.'s vagina with his fingers and then his penis. During penetration, J.D.R. asked [Appellant] to stop because she was in severe pain, but he refused. J.D.R. did not reveal that she had sex with [Appellant] until approximately one-and-a-half years later.

Complainant G.O. first met [Appellant] at karate class when she was six years old and considered him a family friend for years. On the morning of September 27, 2005, [then twelve-year-old] G.O. was at home sleeping when she heard a knock on the door. G.O. got up, opened the door, and saw [Appellant]. [Appellant] told

- 2 -

G.O. that he came to say goodbye because he was leaving Philadelphia. [Appellant] then asked G.O. if he could use the bathroom and G.O. said yes. [Appellant] proceeded upstairs to the second-floor bathroom.

After a few minutes, G.O. thought [Appellant] was taking too long to return so she called up to him. [Appellant] did not answer so G.O. went upstairs to find him. G.O. found [Appellant] in her bedroom. When questioned, [Appellant] said he was just looking at her bedroom. [Appellant] then told G.O. to give him a hug, but G.O. refused and said "let's go downstairs." Instead, [Appellant] grabbed G.O., hugged her, and said he wanted G.O. to remember him. Still holding G.O. in an embrace, [Appellant] positioned G.O. between his legs and lowered her onto the bed. [Appellant] put G.O. on her back while he kept his forearms around her. [Appellant] told G.O. that he would miss her and wanted to give her "stuff" to remember him[]. [Appellant] kissed G.O.'s neck and pulled her pajama pants down. G.O. told [Appellant] to stop, but he ignored her. [Appellant] penetrated G.O.'s vagina with his penis as she lay crying. During the penetration, G.O.'s cell phone rang downstairs. [Appellant] "popped up" from the bed. G.O. then pushed [Appellant] off of her, went downstairs, and answered her cell phone. While she was on the phone, [Appellant] left the house.

G.O. did not immediately report the rape because she was scared and did not trust anyone. Approximately one year later, G.O. told her mother what had happened because she heard [Appellant] was returning to Philadelphia. G.O.'s mother took her to the hospital and filed a police report.

PCRA Ct. Op., 6/27/19, at 3-6 (footnotes omitted).

Both matters proceeded to a consolidated jury trial on July 27, 2010. At trial, G.O. was the first witness for the Commonwealth. *See* N.T. Trial, 7/24/10, at 3. After G.O. testified about the allegations against Appellant, the Commonwealth asked G.O. about her involvement in an unrelated juvenile

case.[2] *Id.* at 21. G.O. explained that, at the time she reported the allegations against Appellant in 2006, the police asked her if she had any other sexual partners. *Id.* G.O. told the police that she had sexual intercourse with another male, then-seventeen-year-old J.S., who was her ex-boyfriend. *Id.* at 22-23. J.S. was ultimately charged with several offenses for engaging in sexual activity with G.O. and the matter was adjudicated in juvenile court. *Id.* at 23. G.O. testified that she wrote a letter recanting her statements involving J.S., but that she did so at the request of J.S.'s mother. *Id.* at 26. However, G.O. confirmed that J.S. ultimately admitted to some of the conduct, resulting in his adjudication for delinquency. *Id.* at 46.

On cross-examination, trial counsel questioned G.O. about the letter she wrote to J.S. recanting her statements to police. *Id.* at 50. Trial counsel successfully elicited testimony that G.O. had changed her story twice in the juvenile matter and had ultimately "lied at the request of somebody else" in

---

[2] As the prior panel of this Court noted,

> [p]rior to trial, Appellant filed a motion *in limine* where he sought "to bring out evidence of [G.O.'s] past sexual conduct insofar as that conduct is shown by her having admitting false sexual abuse claims against other individuals." Appellant's Motion *in Limine*, 5/22/07, at 1-2. Specifically, Appellant sought to introduce evidence of G.O.'s recantation letter and her repudiation of the recantation letter in the case against J.S. *See id.* This evidence was not relevant to any issue other than G.O.'s credibility and . . . was inadmissible under Pennsylvania Rule of Evidence 608. Nevertheless, the trial court granted Appellant's motion and the Commonwealth did not appeal the trial court's order.

*Commonwealth v. Smith*, *A.*, 2018 WL 2188990, *5 n.4 (Pa. Super. filed 14, 2018) unpublished mem.).

- 4 -

her letter to J.S. *Id.* at 52-53. G.O. stated that she spoke with the assigned district attorney in the juvenile matter and ultimately repudiated her recantation letter. *Id.* at 55. Additionally, trial counsel elicited testimony from G.O. that highlighted inconsistencies in her statements to police and her mother's involvement in pursuing the charges against Appellant. *Id.* at 58-65.

In an apparent attempt to rehabilitate G.O.'s credibility, the Commonwealth called Assistant District Attorney Kristen Heine (ADA Heine), who was the prosecutor in the juvenile case against J.S. *Id.* at 96. On direct examination, the Commonwealth elicited the following testimony:

> Q: And did it come to your attention in August of 2006 while you were handling that case that there had been a so-called recantation letter written by [G.O.]?
>
> A: Yes.
>
> Q: When that recantation letter came to your attention, what did you [do] as a result of that?
>
> A: Well, I spoke to the police officers involved in the case, but the most important thing is I read the letter. I looked at what the factual background of the case was, what [G.O.'s] situation was, and then I spoke with [G.O.] about the letter after I had done all those things.
>
> Q: What information did you get from her?
>
> A: She told me that the recantation letter was not true, that what she had originally reported to the police is what happened, that she had been involved in a physical relationship with [J.S.], and that she had had sexual intercourse with him. I don't remember exactly what [] her assault acts were that were involved in the case, but I do remember that [the] original report to the police is what happened.

Q: When you receive such things as a recantation letter, are you required, or do you have certain responsibilities that you must take before you proceed one way or the other?

A: I wouldn't say that there are a list of guidelines, but obviously as a lawyer and a prosecutor you have an obligation not to put a case before a fact finder if you don't believe there is a good faith basis to prosecute the crime. So, if you don't believe a complainant, you can't call him as a witness to testify because he would be suborning perjury. So, if I believe there is a question of credibility, I have to really investigate that and feel confident that my final decision is accurate because of what I learned about the case.

Q: What did you do after you told us you met with [G.O.]? What did you do after that?

A: Based on everything about the case including her telling me that her original report to the police was accurate, I reported to the court . . . that I was ready to proceed to trial. I had had negotiations with the attorney, and I don't remember who it was, and [J.S.] pled guilty . . . to indecent assault and his adjudication was deferred, I believe, which is just a juvenile term meaning he is given a certain amount of time to comply with some conditions, and then the judge makes a decision about what the [] sentence will be at a later date.

Q: Could you have moved forward to trial or moved forward with a guilty plea if you had questions about [G.O.'s] credibility?

A: No, I wouldn't have. In this case I don't remember who gave me the letter, but the letter was actually written to [J.S.'s] mother, and then the letter was turned over to me by the defense. So everybody involved in the case, they knew about it before I knew about it. So, they also -- not that I wouldn't tell somebody -- but they knew what the issues were in the case, and they [knew] about the recantation letter, and J.S. did it, so he was willing to plead guilty in that case.

Q: The way [G.O.] disclosed to the police, did that have any significance in your decision making?

A: Yes, because she disclosed this incident that I'm here today, that the defendant is here on trial for, first, and based on how Special Victims' investigations are done, I'm going to assume that she later disclosed this incident, this relationship, with [J.S].

When asked if she had another sexual partner at the time this incident happened or near the time this incident happened, and that was significant to me because -- it was just clear to me that she did not mean, or she did not want to get [J.S.] in trouble, so to speak.

She was answering the police officer's questions or the detective's questions about this incident, and she told them she had had a relationship with [J.S].

That turned out, unbeknownst to her, to be a crime because of [J.S.'s] age, but he was somebody that she had had a consensual relationship with, and she didn't want to see him get in trouble.

So, it made sense to me that that was how the disclosure was made, and her recantation was not surprising to me given her relationship with the juvenile defendant and the fact that she probably didn't want to get him in trouble for their consensual relationship, because she was a child and she really didn't understand that if she chose to have sex with a man that it would be criminal or that it would get him in trouble.

Q: Just to be clear, you were the assigned prosecutor in the [J.S.] matter. Did you have anything to do with [Appellant]?

A: No. I never saw him before in my life. I didn't know anything about this case.

*Id.* at 98-102. Throughout this testimony, trial counsel did not object.

On cross-examination, ADA Heine stated that although she remembered G.O. stating that her recantation letter was a lie, she could not remember G.O.'s reasons for writing the letter. *Id.* at 114. ADA Heine also testified that she was unsure of whether G.O. told her that J.S.'s mother directed her to write the letter. *Id.* However, ADA Heine stated that, had she known, she would have investigated J.S.'s mother for witness tampering. *Id.* at 115. Further, trial counsel attempted to highlight the differences between the treatment of the charges against J.S., which were pursued in juvenile court,

and the charges against Appellant, which were prosecuted in common pleas court. *Id.* at 112-117.

Ultimately, the jury convicted Appellant of all charges. On January 28, 2011, the trial court sentenced Appellant to an aggregate term of seven to fourteen years' imprisonment. This Court affirmed the judgment of sentence and the Pennsylvania Supreme Court subsequently denied Appellant's petition for allowance of appeal. *Commonwealth v. Smith*, 47 A.3d 862 (Pa. Super. 2012), *appeal denied*, 60 A.3d 536 (Pa. 2012).

On September 3, 2013, Appellant filed a timely PCRA petition arguing, among other things,[3] that trial counsel was ineffective for failing to object to ADA Heine's testimony about G.O.'s credibility in the juvenile case. The PCRA court dismissed Appellant's petition without a hearing.

---

[3] The prior panel of this Court explained:

> Appellant also argued that trial counsel was ineffective because he "questioned [Police Officer Michael O'Brien] in a fashion that elicited testimony that [Officer O'Brien] found G.O. to be credible and opened the door for the district attorney to question [Officer O'Brien] about his belief that she was credible." However, this Court agreed that Appellant's claim lacked arguable merit, as trial counsel did not ask Officer O'Brien "if he believed G.O.'s word that [Appellant] raped her." Rather, counsel posed the following question to the officer: "[s]o your testimony before this jury is that all that it took to arrest [Appellant] for the rape of [G.O.] was [G.O.'s] word; is that correct?" N.T. Trial, 7/27/10, at 125. This question requested a "yes" or "no" answer from the witness and was intended to highlight the absence of physical or other corroborating evidence in the case.

*See Smith, A.*, 2018 WL 2188990 at *5.

On appeal, a panel of this Court held that the PCRA court erred by dismissing Appellant's petition without conducting an evidentiary hearing. *Smith*, *A.*, 2018 WL 2188990 at *8. Specifically, the Court explained that ADA Heine's testimony "was inadmissible and, if trial counsel had objected to the testimony, Rule 608 would have required that the objection be sustained and the testimony stricken. Hence, Appellant's claim has arguable merit." *Id.* at *10. The Court also concluded that "Appellant's petition raises a genuine issue of material fact regarding the 'reasonable basis' and 'prejudice' prongs of his ineffective assistance of counsel claim." *Id.* Therefore, the Court remanded the matter to the PCRA court for an evidentiary hearing. *Id.*

The PCRA court conducted an evidentiary hearing on September 20, 2018. At the hearing, trial counsel testified that he did not object to the prosecutor's testimony because he did not believe that her testimony was harmful to his defense. *See* N.T. PCRA Hr'g, 9/20/18, at 9. Instead, he explained:

> [W]hat I was going to try to illustrate to the jury[,] and I'm almost positive I argued this in closing in some detail[,] was that, ladies and gentlemen of the jury, look how arbitrary this process is, it takes nothing to get a man arrested, just a word of a complainant, you know, and you have district attorney who believes a young lady who has admitted to lying about accusations in the past, [J.S.] got favorable dispensation, and then [Appellant] who had no such track record against him was not being given that kind of favorable disposition, so I kind of wanted to show what I believed to the jury was the unfairness and inherent arbitrariness of the process.

\* \* \*

I wanted [ADA] Heine's testimony in because she was the prosecuting authority. She made the ultimate decision as to how an individual was to be prosecuted, where an individual was to be prosecuted. And that was key I think to try to show the jury the unfairness.

\* \* \*

Here's the thing, I mean, looking retrospectively back at the case, you have [G.O.] admitting to false accusations in the past, and then the inconsistent action of what I believe [ADA] Heine to be exercising by believing her, by believing somebody who admitted to lying, I felt juxtaposing those things together and putting it before the jury, I think it could have raised at least part towards a reasonable doubt.

*Id.* at 8-11.

On December 26, 2018, the PCRA court denied Appellant's PCRA petition. Appellant filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) statement. The PCRA court issued a Rule 1925(a) opinion addressing Appellant's claims.

On appeal, Appellant raises the following issue for review:

Did the PCRA court err when, after a remand from this Court and a resultant evidentiary hearing, it denied [Appellant's] amended PCRA petition that alleged trial counsel's ineffectiveness for failing to object to testimony from a prosecutor that improperly bolstered one of the complainant's testimony, where trial counsel had no reasonable basis for this omission and where [Appellant] suffered prejudice?

Appellant's Brief at 3.

Initially, we address whether Appellant established prejudice. Appellant asserts that "the credibility of the [complainants] was crucial and central to [the Commonwealth's] case, as there was no corroborating physical evidence

- 10 -

of the crimes." Appellant's Brief at 14. Appellant argues that, "[i]n similar circumstances, this Court has awarded new trials where improper bolstering testimony was unreasonably permitted to be introduced at trial." *Id.* at 14-15 (citing *Commonwealth v. Thek*, 546 A.2d 83, 88 (Pa. Super. 1988); *Commonwealth v. Smith, H.,* 567 A.2d 1080 (Pa. Super. 1989)). Appellant argues that, like in *Smith*, "the members of the jury were more likely to defer to the prosecutor, ADA Heine, who is a witness on equal footing with an expert because of her unique knowledge and experience with child victims." *Id.* Appellant asserts that "[e]very aspect of the Commonwealth's case was hotly contested at this trial, and [Appellant] testified. The issue squarely before the jury then was who to believe. The improper bolstering testimony of [] essentially an expert witness necessarily swayed the jury's deliberations." *Id.* Therefore, Appellant concludes that he "was prejudiced by [trial] counsel's failure to object to ADA Heine's testimony wherein she opined on the credibility of G.O." *Id.*

The Commonwealth responds that "[t]here is nothing to suggest that but for ADA Heine's testimony, the jury would have been unconvinced by the evidence." Commonwealth's Brief at 14. The Commonwealth asserts that this point "is emphasized by the fact that ADA Heine's testimony only went toward G.O., yet the jury also found [Appellant] guilty of sexually assaulting J.D.R." *Id.* Further, the Commonwealth notes that Appellant "acknowledges that ADA Heine considering G.O. credible 'was obvious to the jury, because otherwise ADA Heine wouldn't have prosecuted [J.S].'" *Id.* (referring to Appellant's Brief

at 11). Therefore, the Commonwealth contends that "[b]ecause the substance of ADA Heine's testimony would have been obvious to the jury even if she had not testified, then clearly her testimony could not have prejudiced [Appellant]." *Id.* The Commonwealth also argues that the instant matter is "crucially different from the cases upon which [Appellant] relies. In those cases, the court admitted testimony—not from a prosecutor describing the reasons for bringing a prosecution—but from a medical expert giving an expert opinion that the victim's accusations were credible." *Id.* Under these circumstances, the Commonwealth argues that Appellant is not entitled to relief. *Id.*

Our standard of review from the denial of a PCRA petition "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Ousley*, 21 A.3d 1238, 1242 (Pa. Super. 2011) (citation omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." *Commonwealth v. Mitchell*, 105 A.3d 1257, 1265 (Pa. 2014) (citation omitted). This Court "may affirm a decision of the [PCRA] court if there is any basis on the record to support the [PCRA] court's actions, even if we rely on a different basis." *Commonwealth v. Moser*, 999 A.2d 602, 606 n.5 (Pa. Super. 2010) (citation omitted).

We presume that the petitioner's counsel was effective. *Commonwealth v. Williams*, 732 A.2d 1167, 1177 (Pa. 1999). To establish

a claim of ineffective assistance of counsel, a defendant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." ***Commonwealth v. Turetsky***, 925 A.2d 876, 880 (Pa. Super. 2007) (citation omitted).

The burden is on the defendant to prove all three of the following prongs: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." ***Id.*** (citation omitted). Moreover, "[a] failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." ***Commonwealth v. Daniels***, 963 A.2d 409, 419 (Pa. 2009) (citation omitted).

A defendant is entitled to a fair trial, not a perfect trial. ***Commonwealth v. Robinson***, 877 A.2d 433, 443 (Pa. 2005). Further, the prejudice standard for an ineffectiveness claim is a higher standard than the harmless error analysis typically applied when assessing allegations of trial court errors. ***See Commonwealth v. Gribble***, 863 A.2d 455, 472 (Pa. 2004). Instead, a petitioner must prove "actual prejudice," which our Supreme Court has defined as follows:

> [A] reasonable probability that, but for counsel's lapse, the result of the ... proceeding would have been different. "In making this determination, a court hearing an ineffectiveness claim must

- 13 -

consider the totality of the evidence before the judge or jury. . . . Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Ultimately, a reviewing court must question the reliability of the proceedings and ask whether the result of the particular proceeding [was] unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Commonwealth v. Crispell*, 193 A.3d 919, 932 (Pa. 2018) (citations and quotation marks omitted).

Our Supreme Court has stated that "[w]hen an expert definitively testifies to the ultimate conclusion . . . the improper admission of that evidence must by its very nature be so prejudicial as to require a new trial." *Commonwealth v. Balodis*, 747 A.2d 341, 348 (Pa. 2000) (holding that the defendant was prejudiced by counsel's failure to object to an expert witness's testimony that the victim's behavior was consistent with that of a sexual assault victim).

In *Smith*, the defendant was charged with indecent assault and related offenses based on allegations that he sexually abused the seven-year-old complainant. *Smith H.,* 567 A.2d at 1081. After the complainant testified at trial, the Commonwealth called a family therapist who had counseled the complainant after the alleged incidents. *Id.* The Commonwealth qualified the therapist as an expert witness, then asked her to provide her "opinion as to [the complainant's] ability to in character tell the truth." *Id.* Although the therapist gave her opinion that the complainant was truthful, the defendant's counsel did not object. *Id.*

On appeal, this Court found that the defendant's counsel was ineffective for failing to object to the introduction of this testimony at trial. *Id.* at 1082. Specifically, this Court concluded that "[b]y testifying as to the child's character for telling the truth, the Commonwealth's witness usurped the credibility-determining function of the jury. This infringement upon the jury's sacred domain prejudiced [the defendant] because the credibility of the alleged victim was the linchpin of the Commonwealth's case." *Id.* at 1083.

Here, the PCRA court addressed the prejudice prong as follows:

> Prejudice in the context of ineffective assistance of counsel claims requires establishing that there is a reasonable probability that, but for counsel's alleged errors, the outcome would have been different. Appellant has not made this showing. Appellant's claim fails because he has not proven that there is a reasonable probability the outcome would have been different if his counsel had objected. While the [PCRA] court respects PCRA counsel's position, the fact of the matter is that the jury was instructed several times about its role as the sole fact finder in this case. Indeed, in light of [the trial] court's comprehensive jury instruction on credibility, there is no such "probability."

> \*       \*       \*

> The law presumes that the jury followed the [trial] court's instructions, and thus that it neither deferred to ADA Heine's statement regarding G.O.'s credibility nor treated that statement as some form of lay or expert testimony that should substitute its decision.

> Furthermore, Appellant's claim fails because [ADA Heine's] statement regarding G.O's credibility stems from questions involving G.O's recantation in a case from almost four years prior to this trial. . . .

> The [PCRA] court understands Appellant's concerns about ADA Heine's testimony. However, ADA Heine's statement of belief in G.O.'s credibility in the prior case was a mere demonstration that,

based on the recantation letter, certain guidelines had to be met in order to proceed in that case. The statement alone did not deprive Appellant of a fair trial. This is especially true when one considers that trial counsel did not object to ADA Heine's testimony because her testimony supported his theory of the case. It is not the [PCRA] court's role to second guess trial counsel under such circumstances.

In light of the jury instruction, and the strong evidence of his guilt, Appellant cannot demonstrate that he would have been acquitted of the crimes charged but for the testimony of ADA Heine in the unrelated [J.S.] case. To the contrary, the evidence presented established that Appellant sexually assaulted two twelve-year-old victims within a two-month period and that the criminal incidents shared a number of common characteristics. Specifically, the evidence demonstrated that: (1) each victim was twelve years old; (2) each victim was Hispanic; (3) Appellant met each victim when he taught them Tae Kwon Do; (4) Appellant groomed them by first developing a brotherly relationship and then telling each victim that he loved them before the rapes; (5) both rapes occurred at the victim's house or at the place she was then staying; (6) both sexual assaults involved vaginal intercourse; and (7) the crimes occurred within two months of each other.

Accordingly, Appellant cannot show that the outcome of his trial would have been different if only his trial counsel had objected to ADA Heine's testimony about G.O.'s behavior in another case. Furthermore, even if his trial counsel had objected, the testimony may have still been admissible because it helped to explain the ADA's procedure for processing a complaint. In closing, ADA Heine did not specifically give her opinion about whether G.O.'s allegations against Appellant were, in fact, credible. Rather, she merely stated that her assessment of a complainant's credibility was just one factor she considered when determining whether to bring a charge in a criminal case.

Trial Ct. Op. at 9-12 (citations omitted).

Based on our review of the record, we find no error of law in the PCRA court's finding that Appellant failed to establish prejudice, although we reach this conclusion on a different basis. **See Ousley**, 21 A.3d at 1242; **see also**

*Moser*, 999 A.2d at 606 n.5.   Although ADA Heine testified about G.O.'s credibility, her testimony centered on G.O.'s allegations against J.S. and her decision to move forward with those charges in spite of G.O.'s recantation letter.   *See* N.T. Trial, 7/27/10, at 99-104.   Unlike the testimony at issue in *Smith*, ADA Heine's testimony did not go to the ultimate issue of whether G.O. was credible in the instant case or whether G.O. was a credible witness generally.   *See Smith, H.,* 567 A.2d at 1080; *see also Balodis*, 747 A.2d at 348.   Therefore, although ADA Heine's testimony was improper, it did not rise to the level of actual prejudice required to establish ineffective assistance of counsel.

Moreover, by the time ADA Heine testified about G.O.'s credibility, G.O. had already explained to the jury that J.S. was adjudicated delinquent after he ultimately admitted to several of the allegations in that case.   *See* N.T. Trial, 7/27/10, at 46.   Therefore, even without ADA Heine's testimony, the jury could have concluded that the prosecutors found G.O.'s allegations against J.S. credible.   Under these circumstances, we cannot conclude that, but for trial counsel's failure to object to ADA Heine's testimony, the outcome of Appellant's trial would have been different.   Therefore, because Appellant has failed to demonstrate actual prejudice, his ineffectiveness claim fails.   *See Crispell*, 193 A.3d at 932; *see also Daniels*, 963 A.2d at 419.   Accordingly, Appellant is not entitled to relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/22/2020</u>